# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INDEPENDENT LIVING CENTER OF
SOUTHERN CALIFORNIA, INC., a
nonprofit corporation; GRAY
PANTHERS OF SACRAMENTO, a
nonprofit corporation; GRAY
PANTHERS OF SAN FRANCISCO, a
nonprofit corporation; GERALD
SHAPIRO, PHARM. D. doing business
as UPTOWN PHARMACY AND GIFT
SHOPPE; SHARON STEEN doing
business as CENTRAL PHARMACY;
MARK BECKWITH; MARGARET
DOWLING; TRAN PHARMACY, INC.,
doing business as TRAN PHARMACY;
JASON YOUNG,
            *Petitioners-Appellants,*

                v.

SANDRA SHEWRY, Director of the
Department of Health Care
Services, State of California,
            *Respondent-Appellee.*

No. 08-56061

D.C. No.
2:08-cv-03315-CAS-
MAN

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
July 11, 2008—Pasadena, California

Filed September 17, 2008

Before: Stephen Reinhardt, Marsha S. Berzon, and
Milan D. Smith, Jr., Circuit Judges.

13025

Opinion by Judge Berzon

## COUNSEL

Lynn S. Carman and Stanley L. Friedman (argued) for Independent Living Center of Southern California, et al., petitioners-appellants.

Edmund G. Brown, Jr., Attorney General of the State of California; Richard T. Waldow, Supervising Deputy Attorney General; Jennifer M. Kim (argued), Supervising Deputy Attorney General; Phillip J. Matsumoto, Tara L. Newman, Gregory M. Cribs, and Sara Ugaz, Deputy Attorneys General; for Sandra Shewry, Director of the Department of Health Care Services of the State of California, respondent-appellee.

**OPINION**

BERZON, Circuit Judge:

Petitioner-appellants, a group of pharmacies, health care providers, senior citizens' groups, and Medi-Cal beneficiaries (collectively "ILC"),[1] seek to enjoin a state official from implementing legislation reducing payments to medical service providers under the state's Medicaid program, known as "Medi-Cal," by ten percent. ILC alleged in its complaint that the state legislation violates certain provisions of the federal Medicaid Act, and is therefore preempted under the Supremacy Clause.[2] Although ILC sought preliminary relief, the district court denied any such relief, holding that ILC could not allege any viable claim for injunctive relief because none of the petitioners or their members have any federal right to

---

[1]Petitioner-appellants include the Independent Living Center of Southern California, a non-profit corporation providing services to over 8,000 disabled individuals annually; Gray Panthers of Sacramento and San Francisco, senior citizens' advocacy groups whose members include a number of Medi-Cal recipients; Gerald Shapiro, a licensed registered pharmacist operating Uptown Pharmacy & Gift Shoppe, which delivers prescription drugs to roughly 5,000 home-bound patients in Los Angeles; Sharon Steen, co-owner of Central Pharmacy in Santa Monica; Mark Beckwith, a quadriplegic suffering from spinal muscular atrophy who receives medical and pharmacy services under Medi-Cal; Margaret Dowling, a paraplegic who receives part of her medical services under Medi-Cal; Jason Young, an individual suffering from blindness and brain damage who receives in-home support services from a Medi-Cal managed care program; and Tran Pharmacy, Inc., a California corporation operating a retail pharmacy in Garden Grove. Independent Living Center, the Gray Panthers, and the pharmacy petitioners also sued to assert the interests of their respective patients and members. We refer to petitioner-appellants collectively as "petitioners," "Independent Living Center," or "ILC."

[2]The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2.

Medi-Cal payments or benefits. We do not agree that this suit fails for this threshold reason, and therefore reverse.

## I.

## A.

Under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Act"), the federal government provides funds to participating states to "enabl[e] each State, as far as practicable . . . to furnish [ ] medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services[.]" 42 U.S.C. § 1396. Medicaid is a cooperative federal-state program, enacted by Congress pursuant to its powers under the Spending Clause, *see* U.S. CONST. art. I, § 8, cl. 1, that " 'directs federal funding to states to assist them in providing medical assistance to low-income individuals.' " *Ball v. Rodgers*, 492 F.3d 1094, 1098 (9th Cir. 2007) (quoting *Katie A. v. Los Angeles County*, 481 F.3d 1150, 1153-54 (9th Cir. 2007)). To receive federal funds, states are required to administer their programs in compliance with individual "State plans for medical assistance" approved by the federal Secretary of Health and Human Services. 42 U.S.C. § 1396. The Act sets forth detailed requirements for state plans, *see id.* § 1396a(a)(1)-(71), including the specific provision at issue in this appeal.

Under that provision, § 1396a(a)(30)(A) ("Section 30(A)"), a state plan must:

> provide such methods and procedures relating to . . . the payment for[ ] care and services . . . as may be necessary . . . to assure that payments are (consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the

> extent that such care and services are available to the general (population in the geographic area[.]

That is, a state plan must establish reimbursement rates for health care providers that are both consistent with high-quality medical care (the "quality of care provision") and sufficient to enlist enough providers to ensure that medical services are generally available to Medicaid recipients (the "access to care provision"). *See generally Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491 (9th Cir. 1997).

### B.

California Assembly Bill X3 5 ("AB 5"), enacted on February 16, 2008, during a special session convened by the Governor to address the state's budget deficit, reduces payments to medical providers participating in the state's Medi-Cal program by ten percent. Section 14 of AB 5 instructs the Director of the Department of Health Care Services, the state agency responsible for administering the Medi-Cal program, to reduce payments to physicians, dentists, pharmacies, adult day health care centers, clinics, health systems and other providers participating in Medi-Cal's fee-for-service program by ten percent. *See* CAL. WELF. & INST. CODE § 14105.19 (2008). Section 14 also reduces payments to managed health care plans under contract with the Department by the "actuarial equivalent" of ten percent. *Id.* Section 15 of AB 5 instructs the Director to reduce payments for inpatient services provided by acute care hospitals not under contract with the Department by ten percent. *See id.* § 14166.245. All of these cuts were scheduled to take effect July 1, 2008.

ILC filed this suit in California state court seeking to enjoin implementation of AB 5 on April 22, 2008, maintaining that the ten-percent rate reduction violates both the "quality of care" and "access to care" provisions of § 30(A) and is therefore invalid under the federal Constitution's Supremacy Clause, as it conflicts with governing federal law. The com-

plaint alleged that even prior to passage of AB 5, a substantial percentage of medical care providers — 45% of primary care providers and 50% of specialists — were unwilling to participate in the Medi-Cal program due to low reimbursement rates; that 90% of dentists refused to accept Medi-Cal patients; and that Medi-Cal's reimbursement rates for prescription drugs allowed pharmacies to "uniformly earn less than a 10% net profit." By further reducing already-low reimbursement rates, ILC argued, AB 5 would drive even more primary care physicians, specialists, dentists, and pharmacies out of the Medi-Cal program and force existing providers to reduce services. As a result, ILC contended, Medi-Cal recipients would be "denied quality medical services and access to quality medical services," in violation of § 30(A). ILC also maintained that nothing in the legislative history of AB 5 demonstrated that the legislature had considered whether reduced payments would be consistent with efficiency, economy, and quality of care, or whether such payments would be sufficient to enlist an adequate network of health care providers. Rather, the sole purpose cited in the legislation was to "address[ ] the fiscal emergency declared by the Governor" and "implement cost containment measures affecting health services, at the earliest possible time." ILC therefore requested a peremptory writ of mandate or injunction to prevent the Department of Health Care Services[3] and its Director, Sandra Shewry ("the Director"), from implementing AB 5.[4]

## C.

The state defendants removed the suit to federal court, where ILC filed a motion for preliminary injunction. The dis-

---

[3]ILC voluntarily dismissed the Department from suit on June 1, 2008, leaving the Director as the sole defendant.

[4]ILC also alleged in its complaint that the ten-percent rate reduction both violated and was preempted by the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12181 *et seq.* ILC voluntarily dismissed these claims without prejudice.

trict court denied relief, holding that although it was "acutely cognizant of the potential adverse consequences of the ten percent rate reduction," ILC had "no likelihood of succeeding on the merits" because they "do not have any federal rights under § 30(A)."

In reaching this conclusion, the district court relied heavily on this court's decision in *Sanchez v. Johnson*, which held that § 30(A) does not "create an individual right that either Medicaid recipients or providers would be able to enforce under [42 U.S.C.] § 1983." 416 F.3d 1051, 1062 (9th Cir. 2005). Although the district court acknowledged that ILC in this case filed suit under 28 U.S.C. § 1331 and the Supremacy Clause rather than under § 1983, the court viewed this as a distinction without a difference, reasoning that the Supremacy Clause — like § 30(A) — " 'is not a source of any federal rights.' " *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989) (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613 (1979)). In the absence of any "right," the district court concluded, ILC almost surely had failed to state a claim for injunctive relief.

In so ruling, the district court rebuffed ILC's argument that it was entitled to seek purely injunctive relief — which is all it is seeking — on the basis of federal preemption under the doctrine recognized in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983). *Shaw* held that "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause . . . , must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Id.* at 96 n.14. The district court held *Shaw* and its progeny — which, as we shall see, are legion — inapplicable to ILC's claims, holding that *Shaw* preemption claims have been permitted in only three "circumstances": (1) "where the plaintiff claims that a state law requires him to act in violation of federal law;" (2) "where the plaintiff contends that his conduct will be restricted by a state

law that is preempted by federal law;" and (3) "where state law interferes with federally created rights." The court concluded that ILC's claims did not fall under any of these three categories, as "AB 5 neither compels nor restricts petitioners own conduct" and "§ 30(A) does not give rise to a federally created right." ILC's claims thus fell outside the *Shaw* Supremacy Clause doctrine, rendering its probability of success on the merits "low, if not wholly lacking."

ILC immediately sought emergency relief in this court. We granted ILC's motion to expedite oral argument, but denied the balance of its emergency motion. We heard argument on July 11, 2008, and issued an order the same day reversing the district court's decision and remanding for consideration of the merits of ILC's motion for preliminary injunction.[5] This opinion more fully sets forth the rationale for our July 11 order.

## II.

We review a district court's denial of a preliminary injunction for abuse of discretion. *The Lands Council v. McNair*, ___ F.3d ___, 2008 WL 2640001, at *3 (9th Cir. 2008) (en banc). "A district court abuses its discretion in denying a request for a preliminary injunction if it 'base[s] its decision on an erroneous legal standard or clearly erroneous findings of facts.' " *Id.* (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006)) (alteration in original). We therefore review the district court's legal rulings *de novo* and its findings of fact for clear error. *Id.*; *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1157 (9th Cir. 2007).

---

[5]The district court heard argument on the merits of ILC's motion for a preliminary injunction on August 1, 2008, and subsequently entered an order granting ILC's motion in part. *See Indep. Living Ctr. v. Shewry*, No. CV 08-3315 (C.D. Cal. Aug. 18, 2008), *appeal filed*, No. 08-56422 (9th Cir. 2008).

**[1]** In this case, the district court denied ILC's motion for a preliminary injunction based solely on its legal ruling that ILC could not bring suit under the *Shaw* Supremacy Clause doctrine. The only issue before this court is thus whether ILC may maintain a valid cause of action to enjoin implementation of AB 5 on the basis of federal preemption.

## A.

**[2]** The Supreme Court has repeatedly entertained claims for injunctive relief based on federal preemption, without requiring that the standards for bringing suit under § 1983 be met, and without intimating that such claims must fit into one of three categories or "circumstances" in order to be cognizable. In *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973), for example, the Court enjoined a city ordinance prohibiting jet aircraft from taking off between 11 p.m. and 7 a.m. *Id.* at 625-26. Plaintiffs, the owner and operator of a private airport, filed suit under the Supremacy Clause, arguing that the Federal Aviation Act preempted the city's ordinance. *Id.* at 626-27. As the Court noted, the Act permitted the federal government " 'to possess and exercise complete and exclusive national sovereignty in the airspace of the United States,' " *id.* at 626-27 (quoting 49 U.S.C. § 1508(a)), displacing both state and local regulation of airspace and — presumably — any private "right" to occupy airspace at a given time or place. Without questioning plaintiffs' authority to bring suit, the Court proceeded directly to the merits of their claim for injunctive relief, holding the city's ordinance preempted under the Supremacy Clause. *See id.* at 633, 640.

**[3]** In *Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978), the Court proceeded along much the same path. *Ray* involved a claim for injunctive relief brought by the operators of an oil refinery and tanker vessels, who argued that the State of Washington's Tanker Law, which regulated the design, size, and movement of oil tankers in Puget Sound, was preempted by the federal Ports and Waterways Safety Act (PWSA). *Id.*

at 154-56. Without comment on plaintiffs' authority to bring suit under the Supremacy Clause, the Court once again proceeded straight to the preemption analysis. *See id.* at 157. Indeed, none of the Court's seminal preemption cases casts any doubt on the presumptive availability of declaratory and injunctive relief under the Supremacy Clause; to the contrary, the Court has consistently assumed — without comment — that the Supremacy Clause provides a cause of action to enjoin implementation of allegedly unlawful state legislation. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963); *see also* RICHARD H. FALLON, DANIEL J. MELTZER, & DAVID L. SHAPIRO, HART & WECHSLER'S THE FEDERAL COURTS & THE FEDERAL SYSTEM 903 (5th ed. 2003) (describing "the rule that there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision" as "well-established").

**[4]** Perhaps the most well-known in this line of cases is *Shaw v. Delta Air Lines*, *Inc*. *Shaw* involved the claims of several large employers, who brought suit against the Acting Commissioner of the New York State Division of Human Rights, arguing that the State's Human Rights and Disability Benefits Laws — which required employers to treat pregnancy no differently than any other non-occupational disability — were preempted by the federal Employee Retirement Income Security Act ("ERISA"). 463 U.S. at 92. ERISA does not confer any express cause of action on employers to challenge state benefits laws in federal court,[6] but the Court —

---

[6]Section 502(a) of the Act expressly allows participants, beneficiaries, and fiduciaries of a covered employee benefits plan, as well as the Secretary of Labor, to maintain a cause of action under ERISA. *See* 29 U.S.C. § 1132(a). The same provision, however, is silent as to employers, and has generally been interpreted to mean that an employer cannot maintain an action directly under ERISA. *See, e.g., DeMarco v. C & L Masonry, Inc.*,

much as it had in *City of Burbank* and *Ray* — reached the merits of the preemption claims anyway, holding that the state legislation was preempted only insofar as it prohibited practices that were otherwise lawful under ERISA. *Id.* at 108-09. In an oft-cited footnote, the Court emphasized that its decision in *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1 (1983), decided the same day, "does not call into question the lower courts' jurisdiction to decide these cases."[7] 463 U.S. at 96 n.14. Rather, the Court reaffirmed the general rule that a plaintiff seeking to enjoin state law based on federal preemption maintains a valid federal cause of action. As the Court explained,

> It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights.[8] A plaintiff who seeks

891 F.2d 1236, 1240-41 (6th Cir. 1989); *Tuvia Convalescent Ctr., Inc. v. Nat'l Union of Hosp. & Health Care Employees*, 717 F.2d 726, 729-30 (2d Cir. 1983). *But see Associated Builders & Contractors v. Carpenters Vacation & Holiday Trust Fund*, 700 F.2d 1269, 1278 (9th Cir. 1983) (allowing suits by employers in narrow circumstances).

[7]*Franchise Tax Board* applied the "well-pleaded complaint rule" to hold that federal courts lacked jurisdiction to hear cases in which a defendant asserted ERISA preemption as a defense to an action brought by state tax authorities to enforce its levies against funds held in ERISA-covered employee benefit plans. 463 U.S. at 28. *Shaw* distinguished *Franchise Tax Board* by noting that the Tax Board sought a declaration that state laws were *not* preempted, whereas the employers in *Shaw* presented an affirmative claim that the state laws at issue *were* preempted. *See Shaw*, 463 U.S. at 96 n.14.

[8]Although *Shaw* utilized the term "federal rights," it did so before that term had taken on the added significance attributed to it in more recent cases such as *Gonzaga University v. Doe*, 536 U.S. 273 (2002), discussed below. *Shaw*'s description of ERISA makes clear that the Court did not view the statute as creating any substantive "rights" in employers. To the contrary, the Court described ERISA as "a comprehensive statute designed to promote the interests of *employees and their beneficiaries* in employee benefit plans," 463 U.S. at 90 (emphasis added), and noted that the statute itself "does not mandate that employers provide any particular benefits," *id.* at 91.

injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

*Id.* (internal citations omitted). The Court concluded by noting that it "frequently has resolved pre-emption disputes in a similar jurisdictional posture," citing, *inter alia*, *Ray* and *Florida Lime & Avocado Growers*. *Id.* Thus, *Shaw* did not give rise to some unique line of "*Shaw* preemption" cases, but merely reaffirmed the traditional rule that injunctive relief is presumptively available in federal court to enjoin state officers from implementing a law allegedly preempted under the Supremacy Clause.[9] *See Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 259 n.6 (1985) (describing *Shaw* as "reaffirming the general rule" that a plaintiff asserting preemption under the Supremacy Clause has stated a federal claim for injunctive relief).

## B.

[5] Contrary to the district court's conclusion that "*Shaw* preemption claims" have been permitted in only three "circumstances," we know of no authority limiting *Shaw* in this manner, nor has the Director cited any. In fact, the Supreme Court recently reaffirmed *Shaw*'s holding, maintaining that it had "no doubt" as to the authority of private parties to seek

---

[9]Indeed, *Shaw* itself traced the roots of the doctrine to *Ex parte Young*, 209 U.S. 123 (1908), decided seventy-five years earlier. *See* 463 U.S. at 96 n.14. In *Young*, the Court found "ample justification" in the case law to support its conclusion that "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings . . . to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." 209 U.S. at 155-56.

injunctive relief on the basis of federal preemption under 28 U.S.C. § 1331 and the Supremacy Clause. *See Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 642-43 (2002).

Nor are we certain on what grounds the district court concluded that ILC lacked a valid cause of action in this case. The first two of the district court's three "circumstances" — whether the challenged statute "restricts" or "compels" petitioners' own conduct — appear to reflect traditional standing doctrine, which requires a litigant to "demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. E.P.A.*, 127 S. Ct. 1438, 1453 (2007). We address ILC's standing to bring suit separately below, as that inquiry raises questions apart from whether the Supremacy Clause provides a valid cause of action to seek injunctive relief on the basis of federal preemption.

The parties have proceeded on the assumption that the district court denied relief because ILC lacked any judicially enforceable "rights" under the federal statute.[10] The Director

---

[10]As noted above, the district court also concluded that the Supremacy Clause itself does not give rise to any federal "right" to legal relief. In reaching this conclusion, however, the district court relied on a series of cases holding that the Supremacy Clause does not give rise to rights *enforceable under § 1983*, an altogether separate remedial scheme. *See Golden State Transit Corp.*, 493 U.S. at 107-08 ("Given the variety of situations in which preemption claims may be asserted, in state court and in federal court, it would obviously be incorrect to assume that a federal right of action *pursuant to § 1983* exists every time a federal rule of law preempts state regulatory authority. Conversely, the fact that a federal statute has preempted certain state action does not preclude the possibility that the same federal statute may create a federal right *for which § 1983* provides a remedy." (emphasis added)); *Chapman*, 441 U.S. at 612-15 (holding that the Supremacy Clause "is not a source of any federal rights" falling under 28 U.S.C. § 1343(3), the jurisdictional counterpart to § 1983). We explore the distinction between claims for relief under § 1983 and claims for injunctive relief on the basis of federal preemption more fully in Part B-3 below.

specifically urges this court to deny ILC relief "because [§ 30(A)] does not confer a private right of enforcement upon petitioners, which is the necessary predicate to seeking relief under the Supremacy Clause." Were we to accept it, this argument would work a fundamental change in Supremacy Clause jurisprudence. We decline to do so, and thus join several other circuits in holding that a plaintiff seeking injunctive relief under the Supremacy Clause on the basis of federal preemption need not assert a federally created "right," in the sense that term has been recently used in suits brought under § 1983, but need only satisfy traditional standing requirements.

## 1.

[6] Although the Director asserts that the express conferral of a "private right of enforcement" on petitioners is a "necessary predicate" to a claim for injunctive relief under the Supremacy Clause, the well-established rule in both this court and in other circuits is precisely the opposite. In *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261 (9th Cir. 1994), we addressed a claim for injunctive relief brought by a large agricultural employer, who sought to enjoin the California Agricultural Relations Board (ALRB) from adjudicating various unfair labor practice charges. *Id.* at 1264. The employer argued that the ALRB proceedings were preempted by the National Labor Relations Act (NLRA), and were therefore invalid. *Id.* We held that a private party may bring an action in a federal district court seeking to enjoin allegedly unlawful state conduct, noting the "general rule that a private party may seek declaratory and injunctive relief against the enforcement of a state statutory scheme on the ground of federal preemption." *Id.* at 1269-71 (citing *Shaw*). We reached this conclusion "[e]ven in the absence of an explicit statutory provision establishing a cause of action," *id.* at 1269, and regardless of whether the NLRA conferred a federal "right" on employers, *see id.* at 1271 n.13 (finding it unnecessary to apply the four-factor test set forth in *Cort v. Ash*, 422 U.S. 66 (1975)).

Our holding in *Bud Antle* is consistent with established practice in the other circuits, which have universally affirmed the right of private parties to seek injunctive relief under the Supremacy Clause regardless of whether the allegedly pre-emptive statute confers any federal "right" or cause of action. As the Tenth Circuit explained,

> A federal statutory right or right of action is not required where a party seeks to enjoin the enforcement of a regulation on the grounds that the local ordinance is preempted by federal law. A party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.

*Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1266 (10th Cir. 2004) (internal citations omitted); *see also Local Union No. 12004 v. Massachusetts*, 377 F.3d 64, 75 (1st Cir. 2004) (holding that "in suits against state officials for declaratory and injunctive relief, a plaintiff may invoke the jurisdiction of the federal courts by asserting a claim of preemption, even absent an explicit statutory cause of action"); *Ill. Ass'n of Mortgage Brokers v. Office of Banks & Real Estate*, 308 F.3d 762, 765 (7th Cir. 2002); *St. Thomas - St. John Hotel & Tourism Ass'n v. Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000) (holding that "a state or territorial law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption"); *Village of Westfield v. Welch's*, 170 F.3d 116, 124 n.4 (2d Cir. 1999) (holding that a cause of action under the Supremacy Clause "do[es] not depend on the existence of a private right of action under the [preempting statute]"); *Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor*, 107 F.3d 1000, 1005-07 (2nd Cir. 1997) (holding that plaintiff could assert ERISA preemption under the Supremacy Clause, even though it was "beyond dispute" that plaintiff fell outside ERISA's express enforcement provisions); *First Nat'l Bank of E. Ark. v. Taylor*, 907 F.2d 775, 776 n.3 (8th Cir. 1990).

**2.**

**[7]** The Director acknowledges these general principles but argues for a different result in this case, based on the specific statutory provision at issue. The Director provides little, if any, justification for treating a claim of preemption under a federal statute passed pursuant to Congress's spending power differently from a claim of preemption under any of the federal statutes discussed above. But even if she had, this argument has also been flatly rejected by the Supreme Court and the other circuits that have addressed the question.

In *Pharmaceutical Research & Manufacturers of America* ("*PhRMA*") *v. Concannon*, 249 F.3d 66 (1st Cir. 2001), *aff'd sub nom. PhRMA v. Walsh*, 538 U.S. 644 (2003), a pharmaceutical manufacturers trade group challenged a Maine statute designed to lower prescription drug prices for low-income residents by essentially requiring manufacturers to issue rebates.[11] *Id.* at 71-72. PhRMA argued, *inter alia*, that Maine's statute was preempted by the federal Medicaid Act under the Supremacy Clause, and moved for injunctive relief to prevent implementation of the program. *Id.* at 72. In response, the defendants contended that PhRMA could not bring suit in this manner, as the Medicaid Act was not intended to confer any private right on pharmaceutical manufacturers. *Id.* at 73. The First Circuit rejected the defendants' argument, explaining that "PhRMA has not asserted an action to enforce rights under the Medicaid statute . . . but rather a preemption-based challenge under the Supremacy Clause. In this type of action, it is the interests protected by the Supremacy Clause, not by the preempting statute, that are at issue." *Id*. Citing a decision from the Third Circuit, the court noted:

---

[11]To ensure pharmaceutical companies' participation in the program, the statute subjected all drugs produced by manufacturers refusing to offer rebates to "prior authorization requirements," meaning that the drug could not be prescribed to a Medicaid beneficiary unless the state Medicaid administrator specifically approved the prescription. *See id.* at 71-72.

> We know of no governing authority to the effect that the federal statutory provision which allegedly preempts enforcement of local legislation by conflict must confer a right on the party that argues in favor of preemption. On the contrary, a state or territorial law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption.

*Id.* (quoting *St. Thomas - St. John Hotel & Tourism Ass'n*, 218 F.3d at 241). The court thus concluded — in stark contrast to the Director's position in this case — that "regardless of whether the Medicaid statute's relevant provisions were designed to benefit PhRMA, PhRMA can invoke the statute's preemptive force." *Id.*

Although the First Circuit permitted PhRMA to bring suit, the court ultimately held that Maine's statute was not preempted by federal law because there was no conflict between its requirements and those of the Medicaid Act. *See id.* at 74-79. PhRMA successfully petitioned the Supreme Court for certiorari, and the state defendants renewed their claim that PhRMA lacked any federal right to bring suit. Like the Director in our case, defendants argued that "[the Supremacy Clause] does not, by its own force, protect or regulate any interests," and that PhRMA must therefore "look to the allegedly preempting federal statute to find an interest to support standing." Brief for Respondents at 13-17, *PhRMA v. Walsh*, 538 U.S. 644 (2003) (No. 01-188). PhRMA took issue with this claim in its reply brief, noting that the Supreme Court and the lower federal courts had "decided innumerable cases in which parties claiming to be injured by a state law have challenged it as preempted by federal law" and that the Court had never held "that a party directly claiming a Supremacy Clause violation must demonstrate an enforceable right under the preemptive federal law." Reply Brief of Petitioner at 2-3, *PhRMA v. Walsh*, 538 U.S. 644 (2003) (No. 01-188).

Not acceding to the defendants' argument that PhRMA lacked a cause of action under the Supremacy Clause, seven Justices reached the merits of PhRMA's claim for injunctive relief. *See PhRMA v. Walsh*, 538 U.S. at 668 (Stevens, J., joined by Souter, J., and Ginsburg, J.); *id.* at 671 (Breyer, J.); *id.* at 684 (O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J.). Only Justices Scalia and Thomas would have denied PhRMA's ability to bring suit for preemption, although they ultimately concurred in the Court's judgment that Maine's statute was likely not preempted by the federal Medicaid Act. *See id.* at 675 (Scalia, J., concurring in judgment); *id.* at 675-83 (Thomas, J., concurring in judgment).[12] Faced with arguments similar to those presented by the Director in this case, the Court necessarily assumed — albeit implicitly — that a private party seeking to enjoin implementation of a state law allegedly preempted by the federal Medicaid Act may bring suit for injunctive relief directly under the Supremacy Clause.

Although the Supreme Court's decision in *Walsh* affirmed PhRMA's ability to bring suit under the Supremacy Clause *sub silentio*, two circuits have expressly relied on *Walsh* to permit suits for injunctive relief. In *PhRMA v. Thompson*, 362 F.3d 817 (D.C. Cir. 2004), the D.C. Circuit addressed a similar challenge to Michigan's "Best Practices Initiative," which was designed — much like Maine's statute — to provide low-cost prescription drug coverage to state residents. *Id.* at 819. Citing Justice Thomas's opinion in *Walsh*, the defendants argued that there were "serious questions as to whether third parties may sue to enforce Spending Clause legislation —

---

[12]Justices Scalia would have held that PhRMA could not bring suit, because "the remedy for the State's failure to comply with the obligations it has agreed to undertake under the Medicaid Act is set forth in the Act itself: termination of funding." *See id.* at 675 (Scalia, J., concurring in judgment). Justice Thomas argued that the broad discretion conferred by statute on the Secretary of Health and Human Services defeated any preemption claim, and doubted whether "Spending Clause legislation can be enforced by third parties in the absence of a private right of action." *See id.* at 675-83 (Thomas, J., concurring in judgment).

through pre-emption or otherwise." *Id.* at 819 n.3. The D.C. Circuit rejected defendants' argument, holding that by reaching the merits of PhRMA's preemption claim in *Walsh*, the Supreme Court implicitly affirmed PhRMA's authority to bring suit for injunctive relief under the Supremacy Clause. *Id.*

In *Planned Parenthood of Houston v. Sanchez*, 403 F.3d 324 (5th Cir. 2005), the Fifth Circuit relied in part on the Supreme Court's decision in *Walsh* to permit a claim for injunctive relief under the federal Social Security and Public Health Services Acts. *Id.* at 331-32. Several local branches of Planned Parenthood claimed that a Texas statute known as "Rider 8," which restricted the distribution of public funds for family planning services to contractors who pledged not to perform, or to contract with any individual or entity that performed, any elective abortion procedures, was preempted by federal law.[13] *Id.* at 328. Plaintiffs argued, *inter alia*, that the state statute violated the Supremacy Clause by imposing eligibility requirements that were inconsistent with those imposed under the federal funding statutes. *Id.*

In assessing plaintiff's claims for injunctive relief, the Fifth Circuit began by noting that "[i]t is well-established that the federal courts have jurisdiction under 28 U.S.C. § 1331 over a preemption claim seeking injunctive and declaratory relief." *Id.* at 331 (citing *Shaw*). The court then cited *Walsh* and *Thompson* for the principle that "asserting the preemptive force of federal Spending Clause legislation" itself states a claim for relief, even if "[Planned Parenthood was] not seeking to vindicate any right or to enforce any duty running to them." *Id.* at 331-32. After a thorough canvassing of preemption cases, *see id.* at 331-34 & nn. 25, 27-28, 37, 46-47, the court had "little difficulty . . . holding that [Planned Parent-

---

[13]Texas accepted federal funds for family planning services by voluntarily participating in a number of federal programs, including the Public Health Services Act and the Social Security Act. *Id.* at 327.

hood had] an implied right of action to assert a preemption claim seeking injunctive and declaratory relief." *Id.* at 335.

**[8]** We find the reasoning of the D.C. and Fifth Circuits persuasive.[14] For more than a century, federal courts have entertained suits seeking to enjoin state officials from implementing state legislation allegedly preempted by federal law, and we see no reason to depart from the general rule in this case, or in this category of cases. We therefore join several other circuits in holding that a party may seek injunctive relief under the Supremacy Clause regardless of whether the federal statute at issue confers any substantive rights on would-be plaintiffs.

### 3.

**[9]** The reasoning adopted by the other circuits is also helpful in identifying the fundamental flaw with the Director's position. By maintaining that ILC cannot proceed unless it can demonstrate that AB 5 interferes with some federally created right, the Director essentially asks us to apply the test for determining whether a plaintiff may seek relief under 42

---

[14]The district court stated that ILC's reliance on *Concannon* was misplaced because plaintiffs in that case had "established a concrete injury in fact" — standing language, as we shall see — whereas "[h]ere, § 30(A) does not give petitioners any right to Medi-Cal funds." In fact, *Concannon* expressly permitted PhRMA to bring suit for injunctive relief in the absence of any statutory right to Medicaid funds. *See* 249 F.3d at 73. The pharmaceutical manufacturers bringing suit in *Concannon* had no greater "right" to Medicaid funds than the pharmacies and health care providers in this case, and ILC has adequately alleged injury-in-fact. *See* Part II-C, *infra*.

Similarly, there is no viable distinction for present purposes between the restrictions on Planned Parenthood's activities imposed by the statute at issue in *Planned Parenthood v. Sanchez* and the impact of AB 5 on the Medi-Cal providers in this case. AB 5 allegedly prevents petitioners from providing services to Medi-Cal beneficiaries unless they are willing to do so at a financial loss, and thus assuredly "restricts" petitioners' provision of professional services.

U.S.C. § 1983, which provides a remedy for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."[15] The Supreme Court has interpreted the text of § 1983 to require a plaintiff to show the deprivation of "an unambiguously conferred right" in order to support a cause of action brought under § 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). But both the Supreme Court and the courts of appeal have consistently rejected attempts to extend this analysis to claims for purely prospective injunctive relief under the Supremacy Clause, rendering the "rights" requirement inapplicable to ILC's claims in this case.

The Eighth Circuit's decision in *Lankford v. Sherman*, 451 F.3d 496 (8th Cir. 2006), is instructive. In response to severe "budget constraints," the Missouri state legislature amended its state Medicaid plan to eliminate coverage for durable medical equipment ("DME") for most categorically-needy Medicaid recipients. *Id.* at 500-01. Plaintiffs, a group of adult Medicaid recipients, brought suit under both § 1983 and the Supremacy Clause to enjoin state regulations implementing the amendment, arguing that the cuts violated certain provisions of the federal Medicaid Act. *Id.* at 500-02. Like the Director in our case, the defendant argued "that there is no individualized federal right to reasonable Medicaid standards." *Id.* at 507. The court agreed with the defendant *as to the § 1983 claim*, holding that "[r]ather than focusing on an individualized entitlement to medical services, the reasonable-standards provision [of the Medicaid Act] focuses on the aggregate practices of the states in establishing reasonable Medicaid services." *Id.* at 509. The court noted, however, that the § 1983 issue was not dispositive, as plaintiffs had also

---

[15]Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

brought suit under the Supremacy Clause. "Preemption claims are analyzed under a different test than section 1983 claims, affording plaintiffs an alternative theory for relief when a state law conflicts with a federal statute or regulation." *Id.* The lack of any federally created "right" under the Medicaid Act was inconsequential to the Supremacy Clause analysis, and plaintiffs' preemption claim was remanded for consideration on the merits. *Id.* at 513.

The Fifth Circuit reached a similar conclusion in *Planned Parenthood v. Sanchez.* As noted above, plaintiffs sought to enjoin implementation of Texas's Rider 8, which required recipients of federal funds to cut all ties with any organization performing elective abortions. *Sanchez*, 403 F.3d at 328. Advancing the same arguments asserted by the Director in our case, the Texas Department of Health contended that to seek injunctive relief, "plaintiffs must meet the requirements for an action under § 1983, as recently enunciated in *Gonzaga University v. Doe*," namely, that the federal statutes at issue confer privately enforceable "rights." *Id*. at 335. The Fifth Circuit flatly rejected this argument, finding that it "mischaracterize[d]" Planned Parenthood's claim:

> Appellees are not asking the courts to enforce their "right" under § 1983 to secure enforcement of [the Public Health Safety Act], as TDH asserts. Rather, Appellees' Supremacy Clause argument is fundamentally different: they argue that Rider 8 imposes conditions on the receipt of federal funds that are incompatible with [the Act]. Therefore, we need not be concerned that the Supremacy Clause does not of its own force create rights enforceable under § 1983.

*Id.* The court then noted that "*Gonzaga*, by its terms, applies only to § 1983 claims. . . . The Supremacy Clause claim advanced here . . . is not based on a claim of right under [the Act], nor is it a claim for damages; it is a preemption claim. The *Gonzaga* Court gave no indication that it intended to alter

its prior practice regarding such claims." *Id.* The court therefore concluded that a claim of preemption under the Supremacy Clause "does not require a showing, as per *Gonzaga*, that a § 1983 action would also be proper." *Id.*; *see also Local Union No. 12004*, 377 F.3d at 75-76 (distinguishing between claims brought under § 1983 and claims for injunctive relief under the Supremacy Clause); *Qwest*, 380 F.3d at 1266 & n.5 (same); *Burgio & Campofelice*, 107 F.3d at 1005-07 & n.2 (same).

For the reasons identified by the Fifth Circuit in *Planned Parenthood v. Sanchez*, the Director's heavy reliance on our decision in *Sanchez v. Johnson*, 416 F.3d 1051 (9th Cir. 2005), is misplaced. *Johnson* merely applied *Gonzaga* to a claim seeking to enforce the substantive provisions of § 30(A) of the Medicaid Act *brought under § 1983*. We held that the quality of care and access provisions of § 30(A) do not give rise to the type of unambiguously conferred "rights" required under *Gonzaga*. *See id.* at 1055-60. But our decision in *Johnson* had nothing to say about a claim for injunctive relief brought under the Supremacy Clause.

**[10]** Indeed, even as the Supreme Court has tightened the requirements for seeking damages under § 1983, it has consistently reaffirmed the availability of injunctive relief to prevent state officials from implementing state legislation allegedly preempted by federal law. In *Green v. Mansour*, 474 U.S. 64 (1985), two classes of plaintiffs alleged that the State of Michigan's method of calculating benefits under the federal Aid to Families With Dependent Children (AFDC) program violated federal law. *Id.* at 65. While the suits were pending in federal district court, the State altered its program to comply with recent congressional amendments. *Id.* at 65-66. These changes mooted plaintiffs' claims for prospective relief, since it was "undisputed that respondent's calculations thereafter have conformed to federal law." *Id.* at 65. Plaintiffs nonetheless sought "notice relief" and a declaration that Michigan's prior conduct violated federal law. *Id.*

The Court denied relief, holding that plaintiffs' requests for notice and declaratory relief constituted claims for retrospective damages and were thus barred by state sovereign immunity under the Eleventh Amendment. *Id.* at 71-74. All nine justices agreed, however, that injunctive relief would have been available under the Supremacy Clause if changes to the state program had not mooted plaintiffs' prospective claims. *See id.* at 68; *id.* at 77 (Brennan, J., dissenting). Writing for the majority, then-Justice Rehnquist noted that "the availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Id.* at 68.

**[11]** The Director's arguments fail to honor this distinction, broadly asserting instead that because § 30(A) of the Medicaid Act does not confer any substantive "rights," ILC is not entitled to relief of any kind, whether prospective or retrospective. *Green* cautioned against conflating claims for prospective and retrospective relief in precisely this manner, recognizing that a state's interest in continuing to flout binding federal law is illegitimate. 474 U.S. at 68; *see also Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 281 (1997) ("An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient" to seek injunctive relief under *Ex parte Young*). We therefore adhere to the general rule that injunctive relief is presumptively available to remedy a state's ongoing violation of federal law.

## C.

**[12]** Because it held that ILC could not bring suit under the Supremacy Clause, the district court did not technically reach petitioners' standing to bring suit. As noted above, however, the first and second prongs of the district court's *Shaw* analysis — which focused on whether AB 5 "restricts" or "compels" petitioners' conduct — appear to reflect the traditional

requirement that a litigant demonstrate an injury-in-fact to establish Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). On appeal, the Director expressly "does not allege that the named Petitioners do not have standing to bring this action on their own behalf," but rather argues simply that "Petitioners cannot state a claim for relief under the Supremacy Clause."[16] We nonetheless recognize our "independent obligation" to examine our own jurisdiction, *see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990), and therefore briefly address ILC's Article III standing.[17]

**[13]** To satisfy Article III standing requirements, a plaintiff must demonstrate three elements:

> First, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized; and (b)

---

[16]Although the Director does not contest petitioners' standing, she does argue that the interests protected by § 30(A) are not judicially enforceable because § 30(A) concerns "overall methodology" and "merely requires states to consider various factors in setting reimbursement rates." We express no opinion regarding the correct interpretation of the substantive provisions of § 30(A), as such arguments are properly addressed to the merits of petitioners' preemption claim. *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 519 (1990) ("That [the statutory provision at issue] gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the [statute], but it does not render the [statute] unenforceable by a court."); *Orthopaedic Hosp.*, 103 F.3d at 1496-1500 (interpreting the substantive provisions of § 30(A)).

[17]Unlike the Article III standing inquiry, whether ILC maintains prudential standing "is not a jurisdictional limitation on our review." *See Bd. of Natural Res. v. Brown*, 992 F.2d 937, 945-46 (9th Cir. 1993). By failing to articulate any argument challenging ILC's prudential standing, the Director has waived that argument. *Id.* at 946; *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief. We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim . . . ." (internal citation omitted)).

actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal citations and quotation marks omitted). "The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993). In this case, we have no doubt that several of the petitioners, at least, have standing to challenge the implementation of AB 5.

[14] Petitioners include independent pharmacies and health care providers participating in the State's Medi-Cal program that, according to their complaint, will be "directly injured, by loss of gross income," when the ten-percent rate reduction takes effect. The Supreme Court "repeatedly has recognized that such [direct economic] injuries establish the threshold requirements" of Article III standing. *Craig v. Boren*, 429 U.S. 190, 194-95 (1976). Moreover, this injury is directly traceable to the Director's implementation of AB 5, and would certainly be redressed by a favorable decision of this court enjoining the ten-percent rate reduction.

[15] Petitioners also include several individual Medi-Cal beneficiaries, who "will be injured or put at risk of injury by implementation of the 10% provider payments cuts" because those cuts will reduce "quality services, and access to quality services." This injury, like the injury to medical providers discussed above, is the direct result of the Director's implementation of AB 5, and would certainly be remedied by a decision

granting injunctive relief. Such an injury "to those individuals most directly affected by the administration of [a state welfare] program" is sufficient to allow petitioners to seek injunctive relief in federal court. *Rosado v. Wyman*, 397 U.S. 397, 420 (1970).

## Conclusion

Under well-established law of the Supreme Court, this court, and the other circuits, a private party may bring suit under the Supremacy Clause to enjoin implementation of state legislation allegedly preempted by federal law. In this case, ILC alleges that the cuts mandated by AB 5 violate the substantive provisions of the federal Medicaid Act, and are therefore unlawful. They do not seek to enforce any substantive "right" conferred by statute; instead, they argue that the cuts mandated by AB 5 are themselves unenforceable, because they exceed the scope of the State's discretion under the Act and violate federal standards. As AB 5 is causing injury to one or more of the plaintiffs and the other requirements of Article III standing are met, no more is required to allow this suit to go forward.

We express no opinion on the merits of ILC's preemption claim. Rather, we simply reaffirm over a century's worth of precedent and hold that ILC maintains a valid cause of action under the Supremacy Clause to assert such a claim for injunctive relief. The district court's opinion is therefore REVERSED and REMANDED for further proceedings consistent with this opinion.